UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENDELL EATMON,<br><br>    Plaintiff,<br><br>v.<br><br>WARDEN, et al.,<br><br>    Defendants. | Case No. 20-cv-05596-HSG<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**<br><br>Re: Dkt. No. 1 |

Petitioner Kendell Eatmon filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 challenging his conviction and sentence in Alameda County Superior Court. Dkt. No. 1 ("Pet."). Petitioner is currently serving an aggregate state sentence of 52 years to life imprisonment for murder, possession of a firearm by a felon, and shooting at an occupied motor vehicle, with enhancements for personal use of a firearm resulting in great bodily injury. *See* Dkt. No. 4-6, Ex. D at CT178–86. Respondent has filed an answer, Dkt. No. 4 ("Answer"), and Petitioner has filed a traverse, Dkt. No. 8. The Court has carefully considered the briefs submitted by the parties. For the reasons set forth below, the petition is **DENIED**.

**I.  PROCEDURAL HISTORY**

On March 22, 2015, the Alameda County District Attorney charged Petitioner with first degree murder, Cal. Penal Code § 187(a) ("Count 1"); possession of a firearm by a felon, Cal. Penal Code § 29800(a)(1) ("Count 2"); and shooting at an occupied motor vehicle, Cal. Penal Code § 246 ("Count 3"). *See* Answer, Ex. D at CT1–8. The government further alleged that sentencing enhancements were appropriate because Petitioner (1) personally discharged a firearm and inflicted great bodily injury, Cal. Penal Code §§ 12022.5(a), 12022.7(a), 12022.53(b)-(d), (g); and (2) had served four separate prison terms for prior convictions, Cal. Penal Code § 667.5(b).

*Id.*

Following Petitioner's first trial, the jury hung and the court declared a mistrial. *See* Dkt. No. 4-6, Ex. D at CT33. Petitioner's second trial commenced on October 31, 2016. *See id.* at 45–46. On December 5, 2016, the jury found Petitioner guilty as charged and found true all enhancement allegations. *See id.* at 96–98. Additionally, on December 13, 2016, the trial court found the prior convictions alleged to be true. *Id.* at 169–70. Petitioner was sentenced on February 10, 2017, to 52 years to life in state prison. *Id.* at 178–86.

Petitioner timely appealed, and on May 28, 2019, the California Court of Appeal affirmed the judgment of conviction. *See* Dkt. No. 4-3, Ex. A. On August 28, 2019, the California Supreme Court denied Petitioner's petition for review. *See* Dkt. No. 4-4, Ex. B. Petitioner then filed this federal petition for a writ of habeas corpus on August 13, 2020. *See* Pet. He argues that the trial court violated his right to be present when testimony was read back to the jury, and improperly admitted gang expert evidence and a YouTube video that contained inadmissible hearsay. *Id.* In February 2022, the Court denied Petitioner's motion for leave to amend the petition and stay the case. Dkt. No. 14. Accordingly, the initial petition, Dkt. No. 1, remains the operative petition. The Court ordered Respondent to show cause why federal habeas relief should not be granted on this claim. Dkt. No. 3.

## II. BACKGROUND

The following factual background is taken from the May 28, 2019, opinion of the California Court of Appeal:[1]

### A. The Shooting

The victim lived with his mother, his sister, Tiana, and his cousin, Kevin, in Oakland, California. The victim and Kevin were members of the Ney Team, an East Oakland gang. Eatmon was a member of the 76 Bandits, or Bandits, another nearby gang in East Oakland. The Ney Team and the Bandits began fighting after a Bandit gang member murdered a Ney Team gang member on September 3, 2011.

---

[1] The Court has independently reviewed the record as required by AEDPA. *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017). Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2004), unless otherwise indicated in this order.

A little while before the September 2011 murder, the victim and Tiana went to a store on 76th Avenue and MacArthur Boulevard, where they ran into Eatmon and other members of the Bandits gang.  Eatmon asked Tiana if she was "mobbing" for one of her brothers who was in jail at the time, but she did not understand the question.  The victim later told her not to return to that store, so she never went back.

The morning of the murder, Tiana and Kevin saw Antonio, a Bandit gang member, in a local store frequented by the Ney Team.  Tiana bought three cigarettes and left.  Neither of them spoke to Antonio.  Together they walked home, where they saw the victim in the driveway.  The victim told them that he was going to move his car so it would not be towed.  The victim and Kevin left together in the victim's car.  Tiana went inside their home.

A short while later, Tiana left to escort a young neighbor down the driveway to ensure he walked home.  As she returned up her driveway, she heard a loud noise.  She spun around and saw the victim driving his car and Eatmon driving a van.  She made eye contact with Eatmon as he drove by.  Moments later, Tiana heard gunshots and dropped to the ground.

The victim was driving his car up the street with Kevin in the passenger seat when Eatmon's gold van turned towards them and cut them off.  Kevin looked up and saw Eatmon's face just before Eatmon began shooting.  When the shooting stopped, Kevin realized the victim was shot, so he ran home to get help.

Tiana ran up the driveway to her mother, who told her to get the victim.  As she raced towards the victim's car, Kevin was running up the driveway.  He also told her to get the victim.  She found the victim inside his car, shaking and bleeding.  Police responded to the scene, and the victim was transported to the hospital where he was pronounced dead.

When Tiana spoke with Oakland police later that day, she identified Eatmon as her brother's killer.  She even showed Oakland police a photograph of Eatmon by accessing Facebook on her phone.

Oakland police spoke with Kevin a little over a month later.  During that interview, they showed Kevin six photographs, and Kevin identified Eatmon as the shooter.  Kevin further noted that the shooter was driving a gold van.

At Eatmon's trial, both Tiana and Kevin identified Eatmon as the shooter.  Tiana and Kevin also testified about the first murder of a Ney Team gang member.  Kevin described the rivalry between the Ney Team and the Bandits.

### B. The Gold Van with Black Hood

Within hours of the shooting, Oakland police combed the neighborhood to see if there were any surveillance cameras in the area that captured the shooting.  Officers obtained surveillance footage from two nearby homes showing a gold van with a black hood driving on a street near the shooting.

3

Two days after the shooting, Oakland police officers on their way to the police station from the murder scene spotted the same gold van with a black hood. A friend of Eatmon's, Ventrice, was in the van with her children. She was upset at being stopped by police but was cooperative and agreed to speak with the officers.

The police recorded their interview with her. Ventrice said the gold van with the black hood that she was driving belonged to her friend, Eatmon. She explained that Eatmon had called her the day of the shooting to ask if she wanted to use the van. She went to the Coliseum BART station to pick it up. Eatmon had left the keys inside.

Eatmon told her that once she took care of her business with the van to go straight home. When she learned that Eatmon had been arrested for murder, she told police that red flags had "gone off immediately" as she began to wonder whether Eatmon had killed someone in the van or done a hit-and-run. She identified a photograph of Eatmon as the person who had let her use the van but refused to sign it because she was afraid.

The prosecution called Ventrice to testify at Eatmon's preliminary hearing. She changed her story about the van, by claiming that a man named James let her use it.

C.  **Cellular Phone Evidence**

A DA inspector analyzed Eatmon's cellular phone records to approximate his location. Those records showed that Eatmon's phone was in Hayward the morning of the murder, in East Oakland around the time of the murder and near the Oakland Coliseum—where Holmes picked up the van—just after the murder.

Dkt. No. 4-3, Ex. A at 1–4.

**III.   STANDARD OF REVIEW**

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

4

light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 405–06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991).[2] In reviewing each claim, the court must examine the last reasoned state court decision that addressed the claim. *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

## IV.   DISCUSSION

### A.   Claim Based on Jury's Request for Readback

Petitioner argues that the state court "unreasonably rejected [his] claim that the trial court

---

[2] Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default. *Barker v. Fleming*, 423 F.3d 1085, 1091, n.3 (9th Cir. 2005).

5

erred in failing to permit [the] defense to participate in discussions as to what excerpts of a crucial witness' testimony would be read back to the jury." Traverse at 10. Specifically, Petitioner argues that "he was denied his constitutional right to be represented by counsel at a critical stage of proceedings when the trial court twice provided the jury with read backs without permitting the defense to participate in the decisions as to what testimony would be read back." *Id.* Respondent contends that "it cannot be said that a state court's rejection of a claim based upon a defendant's absence during readback 'was contrary to or an unreasonable application of clearly established federal law.'" Answer at 9. Respondent argues in the alternative that any possible error was harmless. *Id.* at 19.

The California Court of Appeal denied the claim as follows:

Eatmon contends that the trial court violated his statutory right to be notified of jury requests for testimony.

**1. Record**

During deliberations, the jury requested a partial read-back of Tiana's testimony. When the transcript was prepared, the reporter went to the jury room to read Tiana's testimony only to have the jury tell her it was no longer needed.

Later that morning, the jury sent a note to the court requesting a read back of Kevin'[s] entire testimony. The court informed counsel of the jury's request. Neither party objected. When the court asked the reporter how long it would take to prepare the testimony, the reporter replied two-and-a-half hours. The court asked the bailiff to inquire of the jury whether it wanted Kevin'[s] entire testimony read back or whether it would like to narrow its request. The bailiff returned with an additional jury note requesting only about 5 minutes of the testimony.

The reporter prepared the requested testimony and read it to the jury without counsel present, after which two jurors requested a few pages of additional testimony. Specifically, the jurors requested that the court reporter read Kevin's testimony that he told his aunt Eatmon was the shooter, his courtroom identification of Eatmon and his identification of Eatmon as the shooter. The reporter informed the judge and the clerk of this request, prepared the transcript, and read the requested testimony to the jury. Neither counsel was informed of these modified requests for only part of Kevin's testimony.

At around 12:00 p.m., the jury informed the court that it had reached a verdict. When counsel arrived at the courtroom for the verdict, defense counsel learned of the modified readback requests, told the court she was never informed of these modified requests, and objected that the court's procedure for providing that read back violated her client's statutory rights. She therefore requested a mistrial. The court stated that a motion for a

new trial was more appropriate because the jury had already reached a verdict. The court denied the motion for a mistrial without prejudice. The jury found Eatmon guilty of all three counts.

Eatmon filed a motion for a new trial, arguing structural error due to the court's failure to inform counsel of the jury's read-back request as required by Penal Code section 1138. The trial court denied the motion for a new trial, making clear that it did not abdicate its authority and that it could find no prejudice as "there was not anything of substance [in Kevin's] testimony that could have moved [the court] to order additional read back."

**2.   Transcript of Read-Back**

The testimony read to the jury began with Kevin testifying that he ran to Tiana and his "auntie" Maria right after the shooting, ran back to the car, then left the scene because he had a warrant and did not want to be there when police responded. He acknowledged that he only spoke to police after he was arrested. He also admitted that he lied when he testified about the murder in the May 2015 preliminary hearing. But Kevin claimed he was telling the truth at trial because he wanted to "keep it real." This portion of the transcript was just shy of five pages long.

The jury then asked for readback of Kevin's in-court identification of Eatmon, which the court reporter provided. In that testimony, Kevin stated that he knew Eatmon "through the streets" and identified him in the courtroom. This was only a half-page of testimony.

The jury also requested Kevin's identification of the shooter, so the court reporter produced a page-long excerpt of Kevin's testimony during which he said he saw the shooter in the driver's seat of the minivan and it was Eatmon. The court reporter also read a brief exchange between the court and Kevin during which Kevin testified that he knew the shooter was Eatmon when he looked up and saw Eatmon's face just before Eatmon started shooting.

**3.   Review**

Penal Code section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." As section 1138's primary purpose is to provide the jury with the evidence it needs for its deliberations, a conviction will only be reversed for violating it if prejudice is shown. (*People v. Frye* (1998) 18 Cal.4th 894, 1007, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 420-421.)

Generally, the trial court must allow the rereading of relevant testimony as requested by the jury. (*People v. Cooks* (1983) 141 Cal.App.3d 224, 261, citing Pen. Code, § 1138.) However, the trial court does not err by asking the jury to decide whether it wants to refine its request if the requested testimony will take considerable time to prepare. (*People v. Anjell* (1979) 100 Cal.App.3d 189, 202–203, disapproved on another ground in *People v. Mason* (1991) 52 Cal.3d 909, 942–943.)

7

While counsel should be notified of jury requests for testimony to ensure that counsel has an opportunity to object to the course of action undertaken by the court or suggest an alternative (*People v. Wright* (1990) 52 Cal.3d 367, 402, disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459.), it is the jury—rather than the parties or their attorneys—that determines what testimony is read back.  (*People v. Ayala* (2000) 23 Cal.4th 225, 289.)  Counsel cannot compel the trial court to order the jury to listen to a reading of testimony that it does not want to hear.  (*People v. Gordon* (1963) 222 Cal.App.2d 687, 689.)

In this case, the trial court complied with section 1138 when it informed the parties of the jury's request for Kevin's complete testimony but violated section 1138 when it failed to inform the parties of the jury's modified request.

The Supreme Court of the United States has never held that a jury request and readback of testimony is a critical stage of a trial that compels review for constitutional error (*People v. McCoy* (2005) 133 Cal.App.4th 974, 982), and our California Supreme Court has made clear that "the rereading of testimony is not a critical stage of the proceedings."  (*People v. Cox* (2003) 30 Cal.4th 916, 963, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 420-421; *accord People v. Horton* (1995) 11 Cal.4th 1068, 1121 ["[t]he reading back of testimony ordinarily is not an event that bears a substantial relation to the defendant's opportunity to defend . . . ."].)  Nevertheless, the standard reviewing courts apply to improper communication between the court and a deliberating jury remains unsettled.  (*People v. Jenkins* (2000) 22 Cal.4th 900, 1027–1028; *People v. Hawthorne* (1992) 4 Cal.4th 43, 68 fn. 14.)  In the absence of specific direction, we will apply the standard of review for constitutional error that has been used by the courts in reported cases and consider whether the failure to apprise Eatmon and his counsel of the jury request for a read back of the Kevin's testimony was harmless beyond a reasonable doubt.  (*See e.g.*, *People v. Jennings* (1991) 53 Cal.3d 334, 383-384.)  Under this standard, we conclude Eatmon was not prejudiced by the court's error.

First of all, the jury requested to hear very specific portions of Kevin's testimony.  The note requested a read back of "only DA question and answer" pertaining to Kevin's identification of Eatmon as the shooter to the victim's aunt and his statement that he never voluntarily spoke to the police.  The other portions read to the jury upon its request to the court reporter were Kevin's two in-court identifications of Eatmon, and a portion when Kevin said he told his aunt that Eatmon was the shooter and he looked at Eatmon right before he started shooting.

Although Eatmon argues that he would have asked that other portions of the testimony be read to remind the jury of Kevin's dubious credibility, his credibility was vigorously attacked by defense counsel in closing argument.  She argued Kevin had a motive to lie because he was facing criminal charges and was hoping for leniency and that Kevin should not be believed because he had given inconsistent statements to police about the crime.  Both points were emphasized and extensively argued by the defense in closing.  So, too, was the point that Kevin could not have been looking at the shooter.

The jury was also instructed on the factors that bear on the credibility or believability of witnesses with CALCRIM No. 226, and of the factors that bear upon the accuracy of

> eyewitness testimony provided in CALCRIM No. 315. Eatmon's counsel went through both instructions in closing argument and emphasized how they applied in this case.
>
> Moreover, nothing in Kevin's testimony rebuts or calls in to question Tiana's identification of Eatmon as the shooter and driver of the van when she spoke to the police on the day of the murder and showed them a photo of Eatmon from Facebook. Eatmon's cell phone was located in the vicinity of the murder when it occurred, and a gold van with a black hood was seen in video footage from the area. Later, Eatmon's phone was near the Oakland Coliseum where his friend picked up the van. She explained that she received a call from Eatmon that day to see if she wanted to use it. In the conversation, Eatmon told her that when she was done with the van, she should drive it straight home.
>
> In short, this record establishes beyond a reasonable doubt that the result would have been no different if additional portions of Kevin's testimony were offered to the jury or read back.
>
> Eatmon argues that the error here is akin to the error in *People v. Dagnino* (1978) 80 Cal.App.3d 981 (*Dagnino*), where the trial court responded to the jury's inquiry by giving it supplemental substantive jury instructions without first consulting counsel. (*Id.* at pp. 984–985.) Because the error occurred during a critical stage of trial proceedings, the appellate court presumed prejudice and required the prosecution to show the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18. (*Dagnino*, *supra*, at p. 989.) No matter. *Dagnino* does not compel a different result here. This case involves neither instruction of the jury without notice to counsel as in *Dagnino*, nor was there anything prejudicial or improper contained within the portion of Kevin's testimony that was read to the jury. (*See People v. Brew* (1984) 161 Cal.App.3d 1102.) The evidence of Eatmon's guilt was overwhelming. The error was harmless beyond a reasonable doubt.

Dkt. No. 4-3, Ex. A at 5–9.

### i. Legal Standard

A criminal defendant has a constitutional right to be present "at any stage of the criminal proceeding that is critical to its outcome or if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). A defendant also has a Sixth Amendment right to the assistance of counsel during critical stages of the proceeding. *Herring v. New York*, 422 U.S. 853, 857 (1975).

### ii. Analysis

The Court finds that the state court's denial of Petitioner's jury readback claim was neither contrary to clearly established Federal law, nor based on an unreasonable determination of the facts. The Ninth Circuit recognized in 2001 that the United States Supreme Court "has never

1 addressed whether readback of testimony to a jury is a 'critical stage of the trial' triggering a
2 criminal defendant's fundamental right to be present." *La Crosse v. Kernan*, 244 F.3d 702, 708
3 (9th Cir. 2001). For this reason, the *La Crosse* court found that the state court's determination that
4 petitioner's right to be present was not violated when testimony was read back to the jury outside
5 his presence was not "contrary to or an unreasonable application of clearly established federal
6 law." *Id.* at 704, 708. Relatedly, the Ninth Circuit has more recently explained in an unpublished
7 memorandum disposition that "[a] readback of an eyewitness' testimony, without counsel's
8 knowledge or permission, has not been condemned by the Supreme Court." *Oubichon v. Cate*,
9 443 F. App'x 235, 237 (9th Cir. 2011). For that reason, the *Oubichon* court concluded that
10 "[w]ithout clear guidance from the Supreme Court, we cannot say that the California court's
11 determination here was contrary to or an unreasonable application of clearly established federal
12 law." *Id.* at 238.
13     Petitioner does not cite any Supreme Court case decided since the *La Crosse* decision that
14 he contends constitutes clearly established law within the meaning of AEDPA. Instead, he relies
15 entirely on Respondent's recognition that "the Ninth Circuit has held that in some circumstances,
16 where neither a defendant nor counsel was notified of, or present at, the readback, a state court
17 determination that no constitutional error occurred may be an unreasonable application of
18 Supreme Court law." Traverse at 11 (quoting Answer at 10). But as Respondent points out later
19 in the same paragraph of its brief, the Ninth Circuit case cited for this principle, *Fisher v. Roe*, no
20 longer supports it. In *Fisher*, the Ninth Circuit recognized that because the Supreme Court "ha[d]
21 never specifically addressed the question of whether a defendant has a right to participate in a
22 readback of testimony, the California Supreme Court's disposition of this case cannot be precisely
23 'contrary to' Supreme Court precedent." 263 F.3d 906, 915 (9th Cir. 2001), *overruled on other*
24 *grounds*, *Payton v. Woodford*, 346 F.3d 1204 (9th Cir. 2003). But *Fisher* expressly relied on the
25 principle that "a state court decision may represent an unreasonable application of Supreme Court
26 precedent if, for example, it 'unreasonably refuses to extend an established legal principle to a new
27 context where it should apply.'" *Id.* The Supreme Court has since rejected that principle. *See*
28 *White v. Woodall*, 572 U.S. 415, 426 (2014) (confirming that "Section 2254(d)(1) provides a

10

1 remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not
2 require state courts to *extend* that precedent or license federal courts to treat the failure to do so as
3 error"). Applying that now-voided principle, the *Fisher* court interpreted the holding in *La Crosse*
4 as limited to situations in which defense counsel knew about the readback and stipulated to the
5 defendant's absence, characterized whether a readback of testimony was a critical stage of a
6 criminal trial as a fact-sensitive inquiry that varies from case to case, and found the state court's
7 decision to be an "unreasonable application" of clearly established law as it had defined that term.
8 263 F.3d at 916–17. The Court thus agrees that in light of *Woodall*, "*Fisher* can no longer stand
9 for the proposition that clearly established federal law provides a defendant with the right to be
10 present at a readback of testimony under certain circumstances." *Fauber v. Davis*, No. CV 95-
11 6601, 2016 WL 9782343, at *1 (C.D. Cal. Dec. 13, 2016). Petitioner cites no other authority he
12 claims amounts to the required clearly established law, and the Court has found none.

13 Moreover, the state court's denial of this claim was not based on an unreasonable
14 determination of the facts. The court of appeals found that the trial court violated a state statute by
15 not informing the parties of the jury's modified readback request, but concluded that "the record
16 establishes beyond a reasonable doubt that the result would have been no different if additional
17 portions of Kevin's testimony were offered to the jury or read back." Dkt. No. 4-3, Ex. A at 10.
18 The court noted that the requested portions of the testimony the jury asked to have read back were
19 limited, and it extensively detailed the state's evidence of Petitioner's guilt, which the court
20 characterized as "overwhelming." *Id.* The court of appeal's ultimate conclusion that the state law
21 error was harmless beyond a reasonable doubt was reasonable and amply supported by the facts,
22 precluding habeas relief on this prong as well.

23 Accordingly, federal habeas relief is **DENIED** as to this claim.

24 **B. Claim Based on Admission of Gang Expert Testimony**

25 Petitioner next argues that "the state court unreasonably rejected [his] claim that the trial
26 court erroneously admitted irrelevant and inflammatory expert testimony and other evidence
27 regarding [his] alleged membership in a criminal gang." Traverse at 12. Respondent argues that
28 because "there was clearly a permissible inference the jury could have drawn from the admission

11

of gang expert testimony," "it cannot be said that the state court's rejection of the constitutional claim was contrary to or an unreasonable application of Supreme Court precedent, nor was it objectively unreasonable in light of the totality of the evidence presented." Answer at 25. Respondent argues in the alternative that any possible error was harmless. *Id.*

The California Court of Appeal denied the claim as follows:

Eatmon contends the trial court should not have admitted expert testimony on gangs to prove motive because it was more prejudicial than probative. Eatmon further claims admission was inappropriate in the absence of a charged enhancement or special circumstance.

**1. Record**

Sergeant Frederick Shavies testified as an expert on East Oakland African-American gangs, particularly Eatmon's gang, the 76 Bandits, and the victim's gang, the Ney Team. Sergeant Shavies gained his expertise while investigating gang criminal activity as an Oakland Police Officer. In his experience, people join such gangs in East Oakland based on neighborhood alliance or family connections. To join, prospective members commit specific violent crimes. Gang members continue to commit crimes in broad daylight to show they will do anything necessary to "take out" rival gangs and to build fear and respect within their community. For example, gangs use drive-by shootings to attack rival gangs and escape quickly. Gangs then use social media to spread their reputation for violence among rival gangs and their community.

Sergeant Shavies testified that the 76 Bandits, or Bandits for short, were an East Oakland gang that sold narcotics and committed shootings and murders. To show membership, the Bandits wore Philadelphia 76ers and the Unocal 76 logos and made hand signs of sevens and sixes. The Bandits also used the phrase " 'all Bandits up' " to show allegiance to the gang. Sergeant Shavies opined that Eatmon was a Bandits gang member based on photographs of the Unocal 76 gas station logo posted to Eatmon's social media profiles, photographs of Eatmon making hand signs of a six and/or a seven, photographs of Eatmon's tattoos , photographs of Eatmon with other Bandits gang members, photographs of other Bandit gang members , and social media accounts with phrases like " 'All Bandits Up' " associated with Eatmon. He also relied on a November 4, 2016 letter Eatmon sent from jail to "Arco," another Bandits gang member whose given name is Jamarco Jackson. Eatmon signed the letter, "ABU Ken," which abbreviation stands for "All Bandits Up."

Sergeant Shavies testified that the Ney Team was another East Oakland African-American gang. The victim and Kevin were members of Ney Team based on photographs of them with other Ney Team gang members in which they also displayed certain hand signs.

Lastly, Sergeant Shavies explained that the Ney Team and Bandits became rivals in September 2011 because a member of the Bandits killed a member of the Ney Team. The Ney Team and Bandits were fighting in August 2013, when Eatmon killed the victim.

**2. Review**

Eatmon contends the court should have excluded Sergeant Shavies' [expert] testimony under Evidence Code section 352 because it was so prejudicial that "deprived [him] of his constitutional due process right to a fundamentally fair trial." Admission of evidence in violation of state law, including the Evidence Code, violates due process if it makes a trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) Nevertheless, we generally review the decision to admit evidence for an abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 547; *People v. Albarran* (2007) 149 Cal.App.4th 214, 224–225 (*Albarran*).)

Under Evidence Code section 352, relevant evidence may be excluded if its probative value is outweighed by a substantial danger of undue prejudice, confusion of the issues, or of misleading the jury. "[T]he trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

Evidence of gang affiliation is relevant and admissible to show a motive was gang related when its probative value is not outweighed by its prejudicial effect. (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1518.) " ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." ' [Citations.]" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1168, *citing People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.) However, given its highly inflammatory nature, a trial court should carefully scrutinize gang-related evidence. (*People v. Williams* (1997) 16 Cal.4th 153, 193.)

Here, the trial court did not err. Eatmon and the victim were members of rival gangs that were fighting, and members had killed each other before the charged incident. This fighting began when a Bandits gang member killed a Ney Team gang member two years before the victim was murdered. Tiana and Kevin saw a Bandit gang member in Ney Team territory earlier that morning. The drive-by shooting was a common tactic that these gangs used to retaliate. "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—[could] help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Sergeant Shavies' expert testimony thus assisted the jury with understanding Eatmon's motive.

Nevertheless, Eatmon claims evidence of his gang affiliation is too tangential and therefore prejudicial because he did not explicitly claim the killing was gang related or brag about the killing as such. But direct evidence of motive is not necessary. Circumstantial evidence can suffice to prove motive and mental state. (*People v. Millbrook* (2014) 222

> Cal.App.4th 1122, 1149 [" '[I]ntent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime.' "]; *People v. Mullen* (1953) 115 Cal.App.2d 340, 343 [circumstantial evidence can prove motive].)
>
> Eatmon further asserts the gang evidence should have been excluded because no gang offense, enhancement, or special circumstance was charged. However, numerous cases have upheld the admission of gang evidence where gang allegations were not charged and where, as here, a defendant's conduct may be part of or directly related to the goals, purposes, and activities of a criminal organization. (*See, e.g.*, *People v. Champion* (1995) 9 Cal.4th 879, 921–925 [upholding admission of gang evidence], overruled on other grounds in *People v. Combs* (2004) 34 Cal.4th 821, 868.) Such admission of gang evidence has been repeatedly upheld, irrespective of the charges, when it "is relevant on the issue of motive or the subject matter at trial." (*People v. Frausto* (1982) 135 Cal.App.3d 129, 140.)
>
> Finally, Eatmon likens his case to *Albarran*, *supra*, 149 Cal.App.4th 214. In *Albarran*, the People argued Albarran had committed a shooting to benefit his gang because of the shooting's location, its timing during a party, and the participation of multiple shooters. (*Id.* at p. 221.) Although the trial court permitted the People to present evidence of Albarran's gang membership, the appellate court held the evidence was too tangential to be relevant. (*Id.* at pp. 227–228, 230–232) *Albarran* is inapposite. The prosecution in *Albarran* presented "no percipient witness or evidence to prove the crime was gang related or motivated" (*Id.* at p. 219), and instead relied exclusively on the testimony of a gang expert. (*Ibid.*) In contrast, here, Kevin testified that Eatmon and the victim were members of rival gangs. A Ney Team gang member had previously been killed by this rival gang, and Eatmon's gang was seen by Kevin and Tiana in the victim's gang's territory the morning of the shooting.
>
> In short, gang expert testimony was not unduly prejudicial and was admissible to prove Eatmon's motive irrespective of whether any gang enhancement or allegation was filed.

Dkt. No. 4-3, Ex. A at 9–13.

### i. Legal Standard

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919–20 (9th Cir. 1991); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985). The due process inquiry on federal habeas review focuses on whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir.

1995); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986).  Only if there are no permissible inferences that the jury may draw from the evidence will its admission violate due process.  *See Jammal*, 926 F.2d at 920.  The analysis focuses on whether the state appellate court's decision affirming the admission of such testimony is contrary to or an unreasonable application of clearly established Supreme Court precedent under 28 U.S.C. § 2254(d)(1).

Even if an evidentiary error is of constitutional dimension, the Court must consider whether it was harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *Dillard v. Roe*, 244 F.3d 758, 767, n.7 (9th Cir. 2001).

### ii. Analysis

The Court finds that the state court's denial of Petitioner's gang expert testimony claim was neither contrary to clearly established Federal law nor based on an unreasonable determination of the facts.  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Supreme Court precedent under § 2254(d)).  The Supreme Court also has left open the question whether the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact.  *See Moses v. Payne*, 555 F.3d 742, 761–62 (9th Cir. 2009); *Briceno v. Scribner*, 555 F.3d 1069, 1078 (9th Cir. 2009) (habeas relief not available under § 2254(d) for claim that expert's opinion testimony as to whether hypothetical robberies would have been gang-related should have been excluded because it pertained to the ultimate issue for the jury).

Petitioner simply fails to identify any clearly established United States Supreme Court precedent he contends meets the AEDPA standard, instead relying entirely on California state court cases.  *See* Traverse at 12–14.  Moreover, the California Court of Appeals' conclusion that there were permissible inferences the jury could draw from the evidence, specifically with respect

to Petitioner's motive, was not based on an unreasonable determination of the facts under the deferential AEDPA standard. Habeas relief is **DENIED** as to this ground.

### C. Claim Based on Admission of YouTube Video

Petitioner last argues that "he was denied his constitutional right to due process by the admission of inadmissible hearsay evidence contained in" a YouTube video introduced at trial. Traverse at 14. Petitioner argues that this evidence "was so prejudicial as to render [his] trial fundamentally unfair." *Id.* Respondent submits that the evidentiary ruling admitting the video did not result in a due process violation. Answer at 25. And Respondent again argues in the alternative that any possible error was harmless. *Id.* at 28.

The California Court of Appeal denied the claim as follows:

> Eatmon also asserts a video featuring Eatmon's gang should not have been admitted because it contained hearsay statements and was more prejudicial than probative.
>
> **1. Record**
>
> The trial court permitted the People to admit a video called "Popped in Oakland" (the video) featuring other Bandit gang members because Eatmon appeared briefly in the video. The video's main subject is a specific Bandit gang member, "Hennesy," who acts as its narrator. He begins the video talking about being shot twice and showing his scars. Hennessy explains that they live on 76th Avenue while showing a Bandit gang member wearing a jacket with a 76ers logo and explaining that they "represent it to the fullest."
>
> Next, the video cuts to shots of the narrator hanging out with other young men showing off stacks of cash and modified cars, while he explains how he was shot building up this lifestyle and reflects, "everything that glitters ain't gold." Eatmon appears on screen for a couple seconds, blending in among other young men admiring the vehicles. The video highlights two other men: a young man who explains how his life was his twenty-first birthday present and a sixteen-year-old sitting in a wheelchair who explains how he was paralyzed by a bullet three years before. The video ends with another Bandit member explaining that the narrator died after being shot and a close-up of a makeshift memorial to him featuring a poster that reads "All Bandits Up."
>
> The "Bandits" are only directly named in the video twice: once when the narrator explains, "it ain't easy being a Bandit," and once when he welcomes the audience to "Bandit-field California."
>
> Eatmon objected to admission of the video, and the court considered the objection in a hearing outside the presence of the jury. The trial court explained in ruling on the objection that Eatmon appeared briefly in the video along with several other Bandits. The

16

> trial court agreed that the video "tend[ed] to show that the Bandits are predisposed to commit crimes," but believed that a possible limiting instruction would resolve any issue.
>
> During the trial, the People introduced the video through gang expert Sergeant Shavies, who testified that it assisted him with his determination that the Bandits were a gang, and that he recognized several Bandit gang members in the video, including Eatmon. The video was admitted into evidence without further objection or request for a specific limiting instruction. The jury was generally instructed that certain evidence was admitted for a limited purpose, and they were to consider it for that purpose and no other.
>
> **2. Review**
>
> Eatmon contends that the video should have been excluded because it contained inadmissible hearsay. Eatmon further claims that admitting the video violated the Evidence Code and his constitutional rights to due process and a fair trial. (Evid. Code § 1200, subd. (b); U.S. Const., Amends. V and XIV; *Chambers v. Mississippi* (1973) 410 U.S. 284, 294.) We review its admission for abuse of discretion. (*People v. Brown*, *supra*, 31 Cal.4th at 547; *Albarran*, *supra*, 149 Cal.App.4th at 224–225.)
>
> The Attorney General claims the video was admitted for the nonhearsay purpose under Evidence Code section 1101 to show Eatmon's motive and identity. For example, in *People v. McKinnon* (2011) 52 Cal.4th 610, the prosecution admitted evidence of rumors that McKinnon's victim had killed one of his fellow gang members to establish McKinnon's motive for murder. (*McKinnon*, *supra*, 52 Cal.4th 655–656.) The court explained that the evidence "was properly admissible for the relevant nonhearsay purpose of showing defendant had heard information about [the] murder and its gang implications 'on the street,' that defendant believed what he had heard, and that he thus had reason, in his own mind, to kill [his victim] 'for Scotty.'" (*Id.* at p. 656.) In sum, this evidence helped "prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)
>
> While not as compelling as in *McKinnon*, here the video was relevant to show Eatmon's status as a Bandit gang member and his motive for revenge on a rival gang. (*People v. Gonzalez* (2012) 210 Cal.App.4th 724, 737–738.) The video could have been edited to exclude certain extraneous and arguably prejudicial material, but its overall probative value outweighed any prejudicial effect. (*People v. Williams* (1997) 16 Cal.4th 153, 194.) We therefore conclude its admission was not unduly prejudicial.

Dkt. No. 4-3, Ex. A at 13–15.

### i. Legal Standard

The same legal standard applies to this evidentiary issue as set out in Section IV.B.i above.

### ii. Analysis

The Court finds that the state court's denial of Petitioner's claim with respect to the

17

YouTube video was neither contrary to clearly established Federal law, nor based on an unreasonable determination of the facts. As explained above, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009); *see also, e.g., Zapien v. Davis*, 849 F.3d 787, 794 (9th Cir. 2015) (because there is no Supreme Court case establishing the fundamental unfairness of admitting multiple hearsay testimony, *Holley* bars any such claim on federal habeas review).

The court of appeal's conclusions that there were permissible inferences the jury could draw from the evidence, specifically with respect to Petitioner's motive as a Bandit gang member to exact revenge on a rival gang, and that the overall probative value of the evidence outweighed any prejudicial effect, were neither contrary to clearly established Federal law, nor based on an unreasonable determination of the facts. Habeas relief is **DENIED** as to this ground.

### D. Cumulative Error

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). Cumulative error is more likely to be found prejudicial when the government's case is weak. *See Thomas v. Hubbard*, 273 F.3d 1164, 1180 (9th Cir. 2001), *as amended* (Jan. 22, 2002), *and overruled on other grounds by Payton v. Woodford*, 299 F.3d 815 (9th Cir. 2002) (noting that the only substantial evidence implicating the defendant was the uncorroborated testimony of a person who had both a motive and an opportunity to commit the crime). However, where only one (or no) constitutional errors exist, nothing can accumulate to the level of a constitutional violation. *U.S. v. Sager*, 227 F.3d 1138, 1149 (9th Cir. 2000) ("[O]ne error is not cumulative error.").

Here, the Court has found no errors, so there is nothing to accumulate to the level of a constitutional violation. Habeas relief is therefore **DENIED** on this ground.

## V. CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## VI. CONCLUSION

The petition for a writ of habeas corpus is **DENIED**, and a certificate of appealability is **DENIED**. The Clerk shall enter judgment in favor of Respondent and close the case.

**IT IS SO ORDERED.**

Dated: 7/17/2023

HAYWOOD S. GILLIAM, JR.
United States District Judge